UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 14-cv-23632

BISCAYNE BAY WATERKEEPER, INC.,
a Florida not-for-profit corporation, DAN
KIPNIS, a Miami-Dade County resident,
MIAMI-DADE REEF GUARD
ASSOCIATION, a Florida not-for-profit
corporation, and TROPICAL AUDUBON
SOCIETY, a Florida not-for-profit corporation,

Plaintiffs/Petitioners,

v.

UNITED STATES ARMY CORPS OF
ENGINEERS,

Defendant/Respondent.
_____/

**MIAMI-DADE REEF GUARD ASSOCIATION'S EMERGENCY MOTION
FOR PRELIMINARY INJUNCTIVE RELIEF AND INCORPORATED
MEMORANDUM OF LAW IN SUPPORT[1]**

Plaintiff, Miami-Dade Reef Guard Association, hereby moves on an emergency basis, pursuant to Rule 65 of the Federal Rules of Civil Procedure, and Rule 7.1(e) of the Local Rules of the Southern District of Florida, for a preliminary injunction enjoining the Defendant, U.S. Army Corps of Engineers ("COE"), from continuing its ongoing "deep dredge" of the Miami Harbor channel at the Port of Miami. The COE's actions are damaging and destroying environmentally threatened populations of *Acropora cervicornis* ("staghorn coral") and their

---

[1] Biscayne Bay Waterkeeper, Captain Dan Kipnis, and Tropical Audubon Society join in this Motion to enforce their rights under the ESA with respect to COE's work that is outside the scope of the Miami Harbor dredging project authorized by the applicable Environmental Resource Permit ("ERP").

designated critical habitat in violation of the Endangered Species Act, 16 U.S.C § 1531 *et seq.* Emergency injunctive relief is necessary because every day that the COE continues dredging results in additional taking of staghorn coral and intensifying environmental harm to its critical habitat that will continue to worsen in the absence of injunctive relief. In support, Plaintiff states:

1. On May 22, 2012, the Florida Department of Environmental Protection ("FDEP") issued a permit to the COE to, among other things, dredge and deepen the Miami Harbor channel. A certified copy of the FDEP permit, Consolidated Environmental Resource Permit ("ERP") No. 0305721-001-BI, and all modifications to the permit are attached as Exhibit 1.

2. The western portion of the Miami Harbor channel lies within or adjacent to the Biscayne Bay Aquatic Preserve (designated by the State of Florida for special protection as an "Outstanding Florida Water," see Fla. Stat. § 258.397) and the Bill Sadowski Critical Wildlife Area. Areas near this portion of the channel have been designated under the Endangered Species Act ("ESA") as critical habitat for Johnson's seagrass, an ESA listed species. 50 C.F.R. § 226.213 (designating Johnson's seagrass critical habitat).

3. Outside Government Cut, the eastern portion of the Miami Harbor channel cuts cross natural reef and hardbottom areas which have been designated under the ESA as "critical habitat" for staghorn coral. 50 C.F.R. § 226.216(b)(1)(ii) (designating the area surrounding the Miami Harbor channel as "critical habitat" for staghorn coral). "Critical habitat" is defined as those geographic areas on which are found the physical and biological features essential to the survival of the species and which may require special protection. ESA Section 3(5), 16 U.S.C. § 1532(5). Staghorn coral is listed as a "threatened" species under the ESA. 79 Fed. Reg. 53851

Case No. 14-cv-23632

(Sept. 10, 2014). An aerial view of the Miami Harbor channel and a depiction of the location of the offshore hardbottom and reef areas in relation to the channel are attached as Exhibits 2 and 2.1 respectively, both of which are true and correct copies taken from the February 2004 COE Final General Reevaluation Report and Environmental Impact Statement for the Miami Harbor dredging project.

4. In 2011 the COE engaged in a "formal consultation" with the National Marine Fisheries Service ("NMFS") regarding the impact of the Miami Harbor dredging on staghorn coral and its critical habitat as required under ESA Section 7(a)(2), 16 U.S.C. § 1536(a)(2), and 50 C.F.R. § 402.14. The consultation resulted in NMFS issuing a Biological Opinion dated September 8, 2011. A true and complete copy of the 2011 Biological Opinion ("2011 BiOp") is attached as Exhibit 3.

5. During the consultation the COE provided NMFS with information indicating that only 31 colonies of staghorn coral were present in the project area. Based on this and other information submitted by the COE the NMFS concluded that the dredging would likely result in the destruction of all 31 colonies of staghorn coral identified by the COE. As a result, NMFS included an Incidental Take Statement granting the COE permission to "take" the 31 staghorn coral colonies in the 2011 BiOp. Also, believing that sedimentation resulting from the dredging would be "localized," "temporary," and "insignificant," NMFS concluded that sedimentation "would not destroy or adversely modify the designated critical habitat for listed corals." 2011 BiOp (Exh. 3), p. 34.

6. As a "Reasonable and Prudent Measure" to minimize the adverse effects of the dredging on the 31 staghorn colonies, NMFS required the COE to, among other things, relocate

Case No. 14-cv-23632

all 31 colonies to a nearby reef location. A "Reasonable and Prudent Measure" is an action NMFS "believes necessary or appropriate to minimize the impacts, *i.e.,* amount or extent, of incidental take," 50 C.F.R. § 402.02. These measures are "non-discretionary," and "must be implemented by the COE." 2011 BiOp (Exh. 3), p. 35.

7.   In October 2013, when the COE sent its contractor back to locate the 31 colonies for purposes of transplanting them, the contractor instead found nearly **eight times** the number of colonies identified previously—**243** (instead of 31). At the point, the contractor simply stopped counting. The COE's findings are discussed in a September 14, 2014, letter from Eric Summa, Chief, Environmental Branch, COE Jacksonville District Planning and Policy Division, to David Bernhart, NMFS Assistant Regional Administrator, Protective Resources Division (COE "documented 243 colonies of [staghorn coral] in the area originally surveyed for the ESA consultation") and in an October 4, 2013, E-mail from the COE's consultant, Craig Kruempel, Tetra Tech Project Manager, to Terri Jordan-Sellers, COE Project Manager (explaining Tetra Tech counted corals at only 6 of 16 locations on the north side of the channel before it stopped counting). An accurate copy of Mr. Summa's September 14, 2014, letter is attached as Exhibit 4. An accurate copy of Mr. Kruempel's October 4, 2013, email is attached as Exhibit 5.

8.   In June 2014 Miami-Dade County employees reported massive plumes of turbidity and sediments blanketing the reefs (see photographs attached as Exhibit 6). Alarmed by these reports, on July 8, 2014, the County sent a team of biologists from the Division of Environmental Resources Management ("DERM") to inspect and photograph the reefs. DERM found heavy sedimentation covering wide areas of the staghorn critical habitat, smothering corals, sponges, and other benthic organisms, as well as recent coral mortality due to excessive sedimentation.

Case No. 14-cv-23632

According to DERM

> Wide view photographs were not possible due low visibility associated with a turbidity plume present at the time of the inspection. Turf algae was not exposed and ~ 1-2cm layer of fine sediment and/or clay was measured on hardbottom and partially buried scleractinians. Heavy sedimentation was observed on scleractinians, octocorals, and sponges. Many scleractinian colonies were mostly covered by sediment with only the higher relief center of the colonies exposed (Figure 6A, C, E). Wafting accumulated sedimentation from the colonies revealed recent mortality (~30-70% of coral skeleton along colony edge) on many scleractinians (Site B, page 6).

A complete and accurate copy of the DERM "Report on Opportunistic Hardbottom/Reef Inspections" dated July 2014 is attached as Exhibit 7.

9. A few weeks following receipt of the DERM report, FDEP conducted its own inspection of the hardbottom and reef areas near the dredging work. FDEP found accumulated dredge related sediments as much as 14 cm thick (roughly 5 inches) across large areas of the staghorn critical habitat and observed coral mortality caused by the sedimentation. FDEP memorialized its findings in a report. A certified copy of the FDEP report, entitled "Field Notes on Impact Assessment Miami Harbor Phase III Federal Channel" is attached as Exhibit 8. In its report, FDEP concluded that

> The observed sediment cover has had a profound effect on the benthos. There were no scleractinian or octocoral recruits or juveniles less than 3 cm in maximum dimension observed along the assessment transects at the Inner and Middle Reefs; other small benthic organisms of the same size were also buried under the sediments. The survival of impacted scleractinian corals and octocorals in size class < 10 cm is highly unlikely; according to our observation, the sediment layer has resulted in anoxic conditions. Larger size classes of scleractinian corals, octocorals, and sponges were also adversely affected by project-related sedimentation, and impacts to these larger organisms is considerable. More than half of the larger scleractinian corals (> 10 cm in max dimension) observed had partial mortality caused by sediment accumulation, which can increase diseases in corals through infections in the affected areas. Erected sponges will lose their attachment because of the burial at the base and the death of tissue, and sponges of rope shape may have the same fate.

> The cohesive nature of fine sediments suggests that the sediment cover may persist for some time and have even more profound effects on the ecological function of the communities.

FDEP Field Notes report (Exh. 8), p. 40.

10. Significantly, FDEP did not attempt to document the full extent of the sedimentation, noting that in some locations the sedimentation extended well beyond the 200 meter (roughly 656 feet) study area.

11. On August 18, 2014, based on its findings, FDEP issued a Warning Letter to the COE stating that "significant impacts to hardbottom beyond those that were permitted were observed" which represent "possible violations of Chapter 373 and Chapter 403, Florida Statutes." In the Warning Letter, FDEP asked, among other things, that the COE fully delineate the geographic scope of the sedimentation. A certified copy of the August 18, 2014, Warning Letter from FDEP is attached as Exhibit 9.

12. On September 12, 2104, the Secretary of FDEP personally sent a letter to the COE asking that the COE resolve the violations through entry of a "consent order." According to the Secretary, failure to comply would result in FDEP "taking legal action to address the violations." A certified copy of Secretary Vinyard's letter is attached as Exhibit 10. On September 22, 2014, the COE responded to Secretary Vinyard's letter, denied it was in violation, and refused to enter into a consent order with FDEP. A certified copy of the COE's September 22, 2014, response is attached as Exhibit 11.

13. In August 2014, following discussion with NMFS, the COE began an assessment of the impact of sedimentation on 40-50 of the staghorn corals. Despite requests, the COE

refused to share all of its data with Plaintiff. An accurate copy of the available results of the COE's ongoing study are attached as Exhibit 12.

14. Dr. Rachel Silverstein, the Executive Director of Biscayne Bay Waterkeeper, is a coral scientist who has reviewed the available COE data, among other data, and opines that dredge related sediments have caused, are causing and will continue to cause staghorn coral mortality and degradation of its ESA designated critical habitat. An accurate copy of Dr. Silverstein's Affidavit is attached as Exhibit 13. *See also* Affidavit of Dr. Andrew C. Baker, Associate Professor, Department of Marine Biology and Ecology, University of Miami Rosenstiel School of Marine & Atmospheric Science, wherein Dr. Baker describes the results of his own inspection of staghorn corals near the channel and opines that sedimentation has resulted in staghorn coral mortality, staghorn larvae mortality, staghorn recruit (baby colonies) mortality, and has significantly degraded the staghorn critical habitat. An accurate copy of Dr. Baker's Affidavit is attached as Exhibit 14.

15. On September 10, 2014, immediately following receipt of the COE's first week of survey data, NMFS issued "Emergency Remediation Recommendations" to the COE. According to the Emergency Remediation Recommendations

> NMFS has determined, based on monitoring reports submitted by the USACE, that there is clearly sediment impact affecting coral colonies, including ESA-listed *Acropora cervicornis* and possibly newly-listed corals, in the project area. There is also evidence of additional background warm temperature stress in the region. Both these factors are contributing to rapid deterioration in colony condition in the project area. Furthermore, accumulation and resuspension of sediments in the project area will continue to affect extant colonies and designated critical habitat as long as the sediments are present. Therefore, emergency relocation of living staghorn colonies should be undertaken immediately and further mitigation (e.g., translocation of additional coral species, CH mitigation) considered.

Case No. 14-cv-23632

An accurate copy of the NMFS Emergency Remediation Recommendations is attached as Exhibit 15.

16.  The COE has refused to implement the NMFS Emergency Remediation Recommendations. Recognizing, however, that the dredging is adversely affecting staghorn coral and its habitat "in a manner and to an extent not previously considered," the COE recently reinitiated formal consultation with NMFS. See September 14, 2014, letter from Eric Summa (Exh. 4.) Notwithstanding the reinitiated consultation, the COE is continuing to dredge--resulting in additional unauthorized "takes."

17.  Excessive sedimentation from dredging operations has killed, is killing and will continue to kill and otherwise result in the "take" staghorn coral colonies. Affidavit of Silverstein (Exh. 13), Affidavit of Baker (Exh. 14.).

18.  Excessive sedimentation from dredging operations is destroying or adversely modifying ESA designated staghorn critical habitat in a manner and to an extent far beyond what was anticipated or authorized in the 2011 BiOp. The habitat has been degraded to the point that staghorn colony reproduction has been significantly impeded. Affidavit of Silverstein (Exh. 13) and Affidavit of Baker (Exh. 14.).

19.  Additional sedimentation from continued dredging is likely to make conditions much worse as sediments continue to accumulate on the corals and other benthic organisms. Affidavit of Silverstein (Exh. 13). These sediments are expected to remain in place for an indeterminate period of time according to FDEP. (FDEP Field Notes, Exh 8.)

20.  Dr. Brian K. Haus, Professor, Department of Ocean Sciences, University of Miami Rosenstiel School of Marine & Atmospheric Science, opines that the sediments from the

dredging are unlikely to dissipate through normal wave and current action. An accurate copy of Dr. Haus' affidavit is attached as Exhibit 14.

21. On July 16, 2014, Plaintiff provided notice of its intent to bring suit against the COE if it failed to comply with the ESA. The COE ignored the notice, thus necessitating judicial review to address these ongoing, egregious ESA violations.

22. Emergency injunctive relief is needed because the COE's dredging is causing massive, dire and ongoing environmental damage to these colonies of staghorn coral and their habitat in violation of the ESA. This is causing irreparable harm to the staghorn corals, the staghorn coral critical habitat and the interests of the Plaintiff and its members. Affidavit of Michael Beach attached as Exhibit 17.

## MEMORANDUM OF LAW

### I. Injunctions Under the ESA

In the typical case a party seeking a preliminary injunction must demonstrate (1) a substantial likelihood of success on the merits, (2) that the movant will suffer irreparable harm unless the injunction is issued, (3) that the threatened injury to the movant outweighs any threatened harm the injunction may cause the opposing party, and (4) entry of the injunction is in the public interest. This is not the standard applicable in ESA cases, however. Finding the ESA is the "most comprehensive legislation for the preservation of endangered species ever enacted by any nation," the Supreme Court held a different standard applies. *Tennessee Valley Auth. v. Hill* 437 U.S. 153, 180 (1978). According to the Court "Congress has spoken in the plainest of words, making it abundantly clear that the balance has been struck in favor of affording endangered species the highest of priorities" and that Congress removed from the courts their traditional

equitable discretion to balance the parties' interests in injunction proceedings. *Id.* at 184, 194. Accordingly, "the third and fourth prongs of the injunction analysis have been foreclosed by Congress." *Fla. Key Deer v. Brown*, 386 F. Supp. 2d 1281, 1284 (S.D. Fla. 2005) *aff'd sub nom, Fla. Key Deer v. Paulison*, 522 F.3d 1133 (11th Cir. 2008). To meet the ESA injunction standard, a party need only demonstrate that "(1) the wildlife at issue is protected under the [ESA], and (2) that there is a reasonable likelihood that the defendant will commit future violations of the [ESA]." *Loggerhead Turtle v. Cnty. Council of Volusia*, 896 F. Supp. 1170, 1180 (M.D. Fla. 1995). As discussed below, Plaintiff has satisfied its burden and is entitled to the entry of a preliminary injunction.

## II. Likelihood of Success

### A. Section 9 Claim.

ESA Section 9 provides that, "with respect to any endangered species of fish or wildlife...it is unlawful for any person...to take any such species." 16 U.S.C § 1538(a). This "take" prohibition has been extended to staghorn coral, an ESA listed "threatened" species by regulation. 50 C.F.R. § 223.208. The COE is a "person" within the meaning of the ESA. 16 U.S.C. § 1532(13).

"Take" means to "harass, harm, pursue, hunt, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19). "Harass" within the meaning of "take" means "an intentional or negligent act or omission which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns which include, but are not limited to, breeding, feeding or sheltering." 50 C.F.R. § 17.3. "Harm" within the meaning of "take" means "an act which actually kills or injures wildlife. Such act may

Case No. 14-cv-23632

include significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, spawning, rearing, migrating, feeding or sheltering." 50 C.F.R. § 222.102.

In addition to actually killing wildlife, conduct "reasonably certain to harm" a protected species is actionable and may be enjoined under the citizen suit provision of the ESA. *Sierra Club v. Babbitt*, 65 F.3d 1502, 1512 (9th Cir. 1995); *see also Loggerhead Turtle*, 896 F. Supp. at 1180 ("the future threat of even a single taking is sufficient to invoke the authority of the [ESA]" and supports the granting of injunctive relief). In fact, "so long as the injury to wildlife occurs, either in the past, present, or future, the injury requirement in the definition is satisfied." *San Carlos Apache Tribe v. U.S.*, 272 F. Supp. 2d 860, 873, (D. Arizona 2003) (quoting *Forest Conservation Council v. Rosboro Lumber Co.*, 50 F.3d 781, 784 (9th Cir.1995)).

Under the ESA the take of a single threatened staghorn coral, even among many, is prohibited. *Loggerhead Turtle*, 896 F. Supp. at 1180 ("The Act does not distinguish between a taking of the whole species or only one member of the species. *Any taking and every taking*—even of a single individual of the protected species—is prohibited by the Act.") (Emphasis in original.)

According to the National Marine Fisheries Service ("NMFS"):

- For staghorn coral, "the physical feature of critical habitat essential to the conservation of the species is substrate of suitable quality and availability, in water depths from the mean high water line to 30 m, to support successful larval settlement, recruitment, and reattachment of fragments. Substrate of suitable quality and availability means consolidated hardbottom or dead coral skeletons free from fleshy macroalgae and sediment cover."

11

- "Sediment accumulation on suitable substrate also impedes sexual and asexual reproductive success [of staghorn coral] by preempting available substrate and smothering coral recruits."

- "The rate of sediment input from natural and anthropogenic sources can affect reef distribution, structure, growth, and recruitment. Sediments can accumulate on dead and living corals and exposed hardbottom, thus reducing the available substrate for [staghorn coral] larval settlement and fragment attachment."

- "Coral larvae settle preferentially on vertical surfaces to avoid sediments and cannot successfully establish themselves in shifting sediment (Army Engineer Research Development Center 2005). Sedimentation has been linked to lower coral growth rates and reduced coral recruitment (Rogers 1990)."

- "Studies have also shown that the survivorship of fragments from branching corals is significantly affected by the type of substrate, with increased mortality being linked to the presence of sandy sediments (Lirman 2000)."

2011 BiOp (Exh. 3), pp. 19, 29. In short, according to NMFS, sedimentation actually kills staghorn corals, impedes reproduction, reduces the rate of growth, and degrades staghorn habitat. A recent study, published since the 2011 BiOp, also shows that corals exposed to dredging sediments are twice as likely to contract diseases, a major factor in the mortality of staghorn coral. Pollock, et al., *Sediment And Turbidity Associated With Offshore Dredging Increase Coral Disease Prevalence on Nearby Reefs,* 2014, available at

http://www.plosone.org/article/info%3Adoi%2F10.1371%2Fjournal.pone.0102498.

The July 2014 DERM "Report on Opportunistic Hardbottom/Reef Inspections" (Exh. 7), the July 2014 FDEP "Field Notes on Impact Assessment Miami Harbor Phase III Federal Channel" (Exh. 8), the COE's own staghorn survey results that have been made available to date and the affidavits of Dr. Silverstein and Dr. Baker demonstrate that sediments generated by the COE's past and ongoing dredging are resulting in a direct take of staghorn corals (mortality,

burial of recruits and fragments, excessive mucus generation, bleaching) and are degrading the ESA designated critical habitat in a manner that itself is resulting in a take (the burial of small recruits and the alteration of the substrate in a manner that prevents larvae survival)—all in a manner and to an extent beyond the take of 31 colonies authorized in the 2011 BiOp Incidental Take Statement. As such, the COE cannot rely on the 2011 BiOp as a safe harbor and take species beyond the authorized take without violating Section 9. *See Strahan v. Roughead*, 910 F. Supp. 2d 358 (D. Mass. 2012) (incidental take statement may shield an agency from Section 9 liability but only if the take limits are complied with).

Based on the evidence submitted from the COE, NMFS, FDEP and DERM, and the accompanying affidavits, Plaintiff has demonstrated a substantial likelihood of success on the Section 9 claim (Count III).

### B. Section 7(a)(2) Claim.

Section 7(a)(2) of the ESA imposes on federal agencies the mandatory duty to insure that their actions will not either (i) jeopardize the existence of an endangered species, or (ii) destroy or modify critical habitat of an endangered species. More specifically, section 7(a)(2) provides that

> Each Federal agency shall, in consultation with and with the assistance of the Secretary, insure that any action authorized, funded, or carried out by such agency (hereinafter in this section referred to as an "agency action") is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species which is determined by the Secretary, after consultation as appropriate with affected States, to be critical, unless such agency has been granted an exemption for such action by the Committee pursuant to subsection (h) of this section. In fulfilling the requirements of this paragraph each agency shall use the best scientific and commercial data available.

16 U.S.C. § 1536(a)(2). Section 7(a)(2) imposes two primary obligations upon federal agencies. "The first is procedural and requires that agencies consult with FWS [or NMFS] to determine the effects of their actions on endangered or threatened species and their critical habitat. *Id.* The second is substantive and requires that agencies insure that their actions not jeopardize endangered or species or their critical habitat." *Fla. Key Deer*, 522 F. 3d at 1138 (11th Cir. 2008)(internal citations omitted).

Here, the COE determined the dredging "may affect" staghorn corals beyond the incidental take authorized in the 2011 BiOp and it reinitiated formal consultation. *See* Exh. 4. This triggered a requirement that NMFS issue "a written statement settling forth [its] opinion, and a summary of the information on which the opinion is based, detailing how the agency action affects the species or its critical habitat." 16 U.S.C. § 1536(b)(3)(A). If NMFS determines the dredging adversely affects staghorn coral or its habitat, NMFS can require that the COE implement "Reasonable and Prudent Measures" identified by NMFS to minimize the impact. 16 U.S.C. § 1536(b)(4). Here, however, while acknowledging the need for formal consultation, which has yet to be concluded, the COE is continuing the unlawful take of staghorn coral and is continuing to degrade the coral's critical habitat. Stated another way, while the COE is "consulting" with NMFS it is simultaneously destroying the very species which is the subject matter of the consultation.

The COE's action of taking while in consultation violates the COE's substantive Section 7(a)(2) obligation and completely undermines the consultation process. *See generally Lujan v. Defenders of Wildlife*, 504 U.S. 555, 603, (1992) (Consultation is "designed as an integral check on federal agency action, ensuring that such action does not go forward without full

consideration of its effects on listed species"), *Sierra Club v. Marsh*, 816 F. 2d 1376, 1385 (9th Cir. 1987) (COE enjoined from "allowing the project's adverse effects to accumulate" in violation of Section 7(a)(2) pending completion of consultation.) Plaintiff has demonstrated a substantial likelihood of success on its Section 7(a)(2) claim (Count I).

### C. Section 7(d) Claim.

ESA Section 7(d) provides that

> [a]fter initiation of consultation required under subsection (a)(2), the Federal agency…shall not make any irreversible or irretrievable commitment of resources with respect to the agency action which has the effect of foreclosing the formulation or implementation of any reasonable and prudent alternative measures which would not violate subsection (a)(2).

16 U.S.C. § 1536(d). Section 7(d) was added to the ESA following the Supreme Court's 1978 decision in *Tennessee Valley* wherein the Court held that injunctive relief was an appropriate remedy under the ESA notwithstanding the fact that construction of the dam that was the subject of the dispute was nearly complete. The purpose of Section 7(d) is to "maintain the status quo" during the Section 7(a)(2) consultation process, *Lane County. Audubon Society v. Jamison*, 958 F.2d 290, 294 (9th Cir. 1997), and "to prevent Federal agencies from steam rolling activities in order to secure completion of projects regardless of the impacts on endangered species." *Fla. Key Deer*, 386 F. Supp. 2d at 1293. See also *North Slope Borough v. Andrus*, 486 F. Supp. 332, 356 (D.D.C. 1980), *aff'd in part by North Slope Borough v. Andrus*, 642 F. 2d 589 (D.C. Cir. 1980) (purpose of Section 7(d) is to preclude the expenditure of large sums of money if there is a reasonable likelihood of jeopardizing the continued existence of a listed species or destroying its habitat and the investment is not salvageable.)

Case No. 14-cv-23632

In October 2013 the COE became aware of at least 212 additional colonies of staghorn coral that had not been included in their original assessment that found only 31 colonies. Following that discovery, the COE *steam rolled* the ocean side dredging of the channel in an apparent effort to complete that portion of the dredging before forced to comply with the ESA and is continuing to do so notwithstanding its decision to reinitiate consultation. The COE's explanation that continued dredging does not violate the ESA because it maintains the ability to "modify the contract specifications" (see Attachment 4 to Exh. 4) does not preclude the application of Section 7(d) as the dredging is itself resulting in a take of the species and degrading critical habitat. *See Fla. Key Deer*, 386 F. Supp. 2d at 1294 (destruction of habitat during consultation violates Section 7(d)). Moreover, this contractual flexibility should have allowed the COE to take steps to prevent the "take" from occurring but the COE refused to exercise its authority to modify the contract specifications.

Plaintiff has demonstrated a substantial likelihood of success on its Section 7(d) claim.

### III. The Irreparable Injury Prong

Environmental injury "can seldom be adequately remedied by money damages and is often permanent or at least of long duration" and, therefore, irreparable. *Amoco Prod. Co. v. Village of Gambell, Alaska,* 480 U.S. 531, 545 (1987). For purposes of evaluating injunction requests under the ESA, "any threatened harm is *per se* irreparable" and "a showing of threatened harm to a protected species creates an irrebuttable presumption that the threatened harm is irreparable." *Loggerhead Turtle v. Cnty. Council of Volusia County*, 92 F. Supp. 2d 1296, 1301 (M.D. Fla. 2000), *Loggerhead Turtle v. Cnty. Council of Volusia County*, 896 F.

Case No. 14-cv-23632

Supp. 1170, 1180 (M.D. Fla. 1995). Likewise, in the Southern District, the irreparable harm test is "whether environmental harm is likely to occur." *Fla. Key Deer*, 386 F. Supp. 2d at 1286.

Plaintiff has demonstrated environmental harm has occurred, is occurring and will continue to occur in the future in the absence of injunctive relief through the affidavits of its experts, the investigations by FDEP and DERM, and by the COE's own staghorn survey results. The facts demonstrate staghorn corals are being taken and its critical habitat degraded. This environmental injury is *per se* irreparable. Moreover, Plaintiff has demonstrated that the Association's and its members' recreational and other interests in the preservation of the reefs and their ability to view and enjoy staghorn coral and its critical habitat has and will continue to suffer irreparable harm as a result of the COE's dredging as well. Affidavit of Beach (Exh. 17).

## CONCLUSION

Plaintiff has demonstrated the COE is engaged in the illegal take of staghorn coral and degradation of its critical habitat. Emergency injunctive relief is necessary to abate these ongoing violations.

**DATED**: October 2, 2014

Respectfully submitted,

COFFEY BURLINGTON, P.A.

By: _____
Paul J. Schwiep, Fla. Bar No. 823244
2601 South Bayshore Drive, Penthouse
Miami, Florida 33133
Phone: 305-858-2900
Fax: 305-858-5261
pschwiep@coffeyburlington.com
*Counsel for Biscayne Bay Waterkeeper*

-and-

17

Case No. 14-cv-23632

James M. Porter, P.A, Fla. Bar No. 443239
9350 S. Dixie Highway, 10th Floor
Miami, Florida 33156
Phone:   786-425-2299
Jim@JamesMPorterPA.com
*Counsel for Plaintiffs/Petitioners*

-and-

Gary M. Pappas, Fla. Bar No. 705853
Carlton Fields Jorden Burt, P.A.
100 SE Second Street, Suite 4200
Miami, FL 33131-2113
Phone:   305-539-7230
Fax:     305-530-0055
gpappas@cfjblaw.com
*Counsel for Tropical Audubon Society*

-and-

Of Counsel:
Eric Glitzenstein
Meyer Glitzenstein & Crystal
1601 Connecticut Ave, NW
Suite 700
Washington, DC 20009
Phone:   202-588-5206
EGlitzenstein@MeyerGlitz.com